## STATE v. CASAD

### SYLLABUS BY THE COURT

(1) It is harmless error to sustain an objection to a question as to the reputation of deceased as a man of violent character or otherwise, "when angry," where witness was asked as˙ to the reputation˙ of deceased for peace and quietude, or for violence, and answered it was bad, and the jury had before it other evidence showing the alleged angry and violent actions of the deceased at the time of the homicide.                                    P. 120

(2)   Alleged error as to the admission of certain evidence considered.                                      P. 122

(3)   Instructions as to the rights of defendant upon his own property, and as to who was the aggressor in the affray, considered and **held** correct.                  P. 122

(4)   The court is not bound to give a requested instruction, even if correct, which is merely cumulative, and states in another form a proposition of law already given to the jury.                                            P. 124

Appeal from District Court, Dona Ana County; Ed Mechem, Judge.

C. Darwin Casad was convicted of manslaughter, and he appeals.    Affirmed.

Holt & Sutherland, of Las Cruces, for appellant.

A. M. Edwards, Asst. Atty. Gen., for the State.

### OPINION OF THE COURT

RAYNOLDS, C. J.    Appellant was indicted for the murder of one Antonio Bermudes, found guilty of manslaughter, and sentenced to five to six years in the penitentiary. From this judgment sentencing him, the appellant appeals to this court.

The testimony of the prosecution showed that, on the evening of May 25, 1916, the deceased, who was a tenant of the appellant was returning to the farm with his baling outfit and crew; that he was handling the appellant's farm on shares; that, for a number of days prior to the killing, he had been engaged in baling alfalfa for a neighboring farmer, whose property was adjacent to that of the appellant; that appellant had protested to the deceased that he was neglecting appellant's alfalfa and that deceased promised he would commence baling appellant's alfalfa on the day of the killing; that appellant went to El Paso on that day and, upon his return, discovered that deceased had not begun baling the alfalfa; that the appellant thereupon nailed up the wire gate which had been theretofore used as a means of egress and ingress from and to appellant's land; that, having nailed up the gate, appel-

lant sat down on the ditch bank which is just inside
his property near the gate, and awaited the arrival of
the deceased and the baling outfit and crew, having
seen the party approaching as he finished nailing up
the gate. When the baling crew approached the gate,
appellant forbade deceased to enter the premises. De-
ceased protested and declared he would enter. De-
ceased removed the three lower wires of the gate from
one of the posts, and, having done so, stooped under
the top wire and stepped in the direction of the ap-
pellant who, meanwhile, had remained seated on the
ditch bank and had told deceased not to enter; that,
as deceased stepped from the gate in the direction of
the appellant, the latter pulled his pistol and fired the
fatal shot.

The testimony for the defense was to othe effect that
various members of the baling crew were armed with
pitchforks and other implements; that the deceased was
armed with a large Stillson wrench, which he used
in breaking the wires loose from the post; that as he
went under the top wire, he advanced upon the de-
fendant in a threatening and menacing manner, ex-
claiming, ''I will kill you, cabron''; that the defendant
believing himself to be in imminent danger then fired
the fatal shot. The witnesses for the defendant testi-
fied that, within 10 or 15 minutes after the shooting,
they saw the Stillson wrench lying on the ground near
the body of the deceased, but did not know what be-
came of it. They were the first persons who arrived at
the body after the killing. One of them, a brother of
the appellant who arrived at the scene of the shooting
within three or four minutes after it occurred, testi-
fied the following conversation occurred between him
and his brother, the appellant; that witness said:
''What have you done?'' and the appellant replied, ''I
have killed Antonio.'' The witness said, ''You have
played hell;'' and the appellant replied, ''I had to do
it, or he would have killed me.''

This testimony further showed that there was a con-

troversy between appellant and deceased over deceased's neglecting to bale appellant's alfalfa, and that appellant had stated he would bale it himself, unless deceased began baling on the day of the killing; that, when appellant found on his return from El Paso that deceased had not kept his promise, he got some staples and nailed up the wire gate above mentioned; that he sat down on the ditch bank to await the arrival of the deceased for the purpose of forbidding him access to the premises; that, when deceased arrived, he told him that he had previously told him he need not come back to the ranch, and he then forbade him to enter. Deceased then asked: "Where shall I go through?" and appellant replied, "You can go around by the road;" that deceased then said, "I will show you where I will go through," and thereupon began to break off the wires with a wrench; and appellant then stated, "Don't do it; don't go through there, Antonio;" to which deceased replied, "I will show you;" and that after he had broken off three lower wires he grabbed the top wire, ducked under it, and then said to the appellant, "I will kill you, cabron," advancing upon the appellant; that appellant at that moment pulled his pistol and fired the fatal shot, because he thought deceased was going to kill him.

[1] Appellant urges upon us numerous grounds of error of the lower court for reversal, but relies principally upon the exclusion of a question to the general reputation of the deceased for peace and quietude or violence when angry. The transcript shows the following:

"Q. Did you know his general reputation in the community in which he lived as being a man of violent character or otherwise, when he was angry?

"Mr. Hamilton: Object; that is not the proper question.

"The Court: Objection sustained.

"Mr. Holt: Exception.

"Q. Did you know his general reputation in the community in which he lived for peace and quietude or for violence? A. I knew his reputation; yes.

"Q. Well. what was that reputation—good or bad as to peace and quietude or violence? A. Well, he, when he got angry—

"Mr. Hamilton: Object; and ask that it be taken from the jury.

"The Court: Objection sustained. Gentlemen of the jury, you will disregard the last answer of the witness.

"Mr. Holt: Exception.

"Q. Now, Mr. Casad, answer the question as to his general reputation, whether it was good or bad in those respects that I have mentioned. A. Bad."

Appellant contends that the court erred in refusing to allow the question to be asked as it was first asked, and that, by limiting the proof of the deceased's reputation to the general question error was committed. The rule is undoubtedly to the effect that proof of character of the deceased in prosecutions for homicide is not confined to general reputation, that his character under special and exceptional circumstances may be shown, where such circumstances appear to have existed at the time of the affray in which the killing took place. See note to State v. Feeley, 3 L. R. A. (N. S.) 351. The jury had before it the fact that the reputation of the deceased for peace and quietude or violence was bad. It also had before it the circumstances of the controversy out of which the killing arose, the angry actions of the deceased, according to the testimony of the appellant and his witnesses. If the general reputation of the deceased for peace and quietude was bad, it is difficult to see how it would be different if he were angry. The appellant apparently seeks to intensify the reputation of the deceased as a man of violence. The admission of the answer to the question as asked, and excluded, would have added nothing to the jury's information, and its exclusion deprived the appellant of no material evidence, nor under the circumstances of this case did it prejudice him. Theoretically, adhering to the strictest technical rules, the question was proper, and the answer thereto should have been admitted. We are aware that this court has held that the doctrine of harmless error, in a criminal case, is dangerous (State v. Chesher, 22 N.

M. 319, 325, 161 Pac. 1108), but it would be indulging in refinements too subtle for practical application, to hold that the exclusion of such an answer, under the circumstances of this case, is prejudicial and reversible error.

[2] The defense put in evidence the fact that the deceased had neglected the alfalfa, by allowing it to lie on the ground 10 or 12 days after cutting, and to bleach and lose weight, as a reason why the defendant had declared deceased's lease forfeited, and as accounting for defendant's conduct in closing up the entrance to the field and forbidding deceased to enter with his hay-baling outfit. In rebuttal, the prosecution showed over objection, which is now urged as error, that the hay was not damaged by the delay in baling, seeking thereby to draw the inference that defendant's motive in closing the entrance and forbidding deceased to enter was not as claimed by him. In surrebuttal, defendant showed that the hay was greatly damaged by the delay in baling. This testimony all reflected upon the good faith of the defendant in his conduct immediately preceding the homicide, and we fail to appreciate the objection urged by counsel for the defendant. Of course the real question was not what the actual condition of the hay was, but what defendant reasonably believed it to be on account of deceased's delay. But the circumstances were such that the defendant claimed to know the condition of the hay, which could only be true by examination by him, and the real fact as to such condition reflected directly upon his claim to know such condition.

[3] Defendant's requested instruction No. 1, was properly refused. It was as follows:

"You are instructed that, if you believe from the evidence, that, prior to the shooting alleged in the indictment in this case, the deceased had committed a breach of his contract with the defendant by willfully failing, neglecting, or refusing to bale the alfalfa on the Casad ranch at the proper time, or within the proper time after the same had been cut, then, as a matter of law, defendant had a lawful right

State v. Casad, 28 N. M. 117

to terminate the existing contractual relations between himself and deceased, and to forbid him again to bring his baling outfit on the premises and to deny him the further use of the entrance to said premises, near which the aforesaid shooting occurred; and that defendant had a lawful right to resist any forcible attempt upon the part of the deceased to effect an entrance to defendant's premises through said gate, with such degree of force as was, or to the defendant appeared to be, necessary to repel such attempted forcible entrance upon the part of the deceased."

This instruction brings into the case the question of the right to resist trespass upon real property, and does not give the law upon the subject. The instruction, as presented, would authorize the jury to believe that the defendant was justified in killing deceased, in resisting his entrance upon the land. The law was correctly given in instruction No. 12½ as follows:

"You are instructed that the defendant had a lawful right, upon his own premises, in a peaceable manner, to inform the deceased of defendant's desire to terminate the existing contract between the deceased and the defendant; and, if you believe from the evidence, that, at the time of the shooting, the defendant was upon his own premises, engaged in the peaceable mission of informing the deceased of defendant's desire to terminate such existing contract, and that there was no overt act by the defendant until the instant when the fatal shot was fired by defendant, under the circumstances and in the belief testified to by defendant, then, under such circumstances, the defendant would not in law be regarded as the aggressor; but it is for you to determine, in the light of all testimony in the case which you believe to be true, as to who was the aggressor at the time of the fatal encounter; and, before you can find that the defendant was the aggressor, you must be convinced of such fact by the evidence which you believe to be true, beyond a reasonable doubt."

The portions of instruction No. 12, objected to by the defendant, were not improper. Counsel admitted the correctness of the same, in so far as they explained the law of self-defense, but insisted they gave the jury a wrong impression without the giving of requested instruction No. 1 in connection therewith. As before seen, requested instruction No. 1 was erroneous, was properly refused, and the defendant is not in a position to assign error for that reason. But the instruction complained of in connection with instruction No. 12½

above set out, was in no sense misleading. The latter instruction fully and specifically advised the jury that, if the facts were as claimed by the defendant, he would not be the aggressor, and would not, by reason of having nailed up the gate and having forbidden deceased to enter, be deprived of the right of self-defense.

[4] The requested instruction No. 3 was fully covered by instruction No. 12, and was properly refused. The court is not bound to give requested instructions which are merely cumulative. A careful reading of all the instructions and those requested convinces us that the case was fully and fairly presented to the jury.

The judgment is therefore affirmed, and it is so ordered.

PARKER and DAVIS, JJ., concur.